AUSA:     Steven P. Cares          Telephone:  (313) 226-9139
AO 91 (Rev. 11/11)  Criminal Complaint     Special Agent:      Brett Mason, FBI          Telephone:  (313) 965-5085

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

United States of America
   v.

Michael Pacteles

Case: 2:21−mj−30590
Assigned To : Unassigned
Assign. Date : 12/14/2021
CMP: SEALED MATTER (MAW)

**CRIMINAL COMPLAINT**

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___July 19, 2019 to December 17, 2019___ in the county of _____Wayne_____ in the
_____Eastern_____ District of _____Michigan_____, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 666(a)(1)(B) | Bribery in programs receiving federal funds |

This criminal complaint is based on these facts:

See Attached Affidavit.

☐ Continued on the attached sheet.

_____
*Complainant's signature*

_Brett Mason, Special Agent, Federal Bureau of Investigation_
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date:  _December 14, 2021_

City and state:  _Detroit, Michigan  48226_

_____
*Judge's signature*

Elizabeth Stafford, United States Magistrate Judge
*Printed name and title*

## <u>Affidavit in Support of a Criminal Complaint</u>

The affiant, Brett Mason, being duly sworn, deposes and states as follows:

## <u>INTRODUCTION</u>

1.      I submit this affidavit in support of a complaint charging MICHAEL PACTELES, who was, at the time of the conduct in the case, a detective with the Detroit Police Department ("DPD"), with federal programs bribery, in violation of 18 U.S.C. § 666(a)(1)(B). As explained in more detail below, PACTELES agreed to provide sensitive police information, including vehicle registration information from the Michigan Law Enforcement Information Network (or LEIN) in exchange for things of value. In fact, PACTELES received a total of $7,724 in things of value—a salvaged used car, tax, title, and plate costs (valued at $4,424) and $3,200 in cash—for agreeing to provide this information.

2.      I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C). I am a Special Agent with the FBI Detroit, Michigan Field Office (FBI Detroit), assigned to

1

the Public Corruption squad, which is located in the Eastern District of Michigan.

3.     I make this affidavit from personal knowledge based on my participation in this investigation, including reports from other law enforcement agents, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. The information outlined below is provided for the limited purpose of establishing probable cause and does not contain all details or all facts of which I am aware relating to this investigation.

## PROBABLE CAUSE

4.     Agents learned the following information from in-person and telephonic interviews, recordings, and text messages.

5.     In 2019, an individual involved in the towing industry ("Tower A") possessed an inventory of vehicles, some of which had previously been stolen. Tower A contacted DPD and asked for an officer to come and "recover" the vehicles. (I know from my training, experience, and communications with other officers / agents, that "recover" refers to a specific DPD process where stolen vehicles are

2

officially documented as having been seized. Then, DPD or the tow company makes official notifications to the owner, lien holder, or other interested parties. If there are no interested parties, the vehicle is auctioned and the tow company can subtract towing and storage fees from the auction price.)

6.     On July 19, 2019, then DPD detective PACTELES showed up at Tower A's yard to discuss the inventory of vehicles. PACTELES explained to Tower A that his daughter needed a car. When Tower A offered to look for one, PACTELES responded that he would "owe [Tower A] forever" if Tower A got him the car.

7.     On July 19, 2019, PACTELES sent a text message to Tower A, explaining that "Both cars have been recovered and out of the system" so Tower A "[is] good." In response, Tower A sent a message that "I'll let u know on car after I go threw [sic] them."

8.     Because the stolen vehicles were now not in DPD's system, PACTELES later told Tower A that he can "do what you want with them." (A few weeks later, a DPD sergeant learned what PACTELES had done and required PACTELES to properly recover the stolen vehicles.)

3

9.     On July 22, 2019, Tower A sent a text message to PACTELES that he "found a good shape 08 impala of [sic] u want to check [it] out." PACTELES responded "Awesome..thanks."

10.    On September 19, 2019, Tower A sent a text message to PACTELES asking "Did u end up handling car for ur daughter? I still have that impala on the side." PACTELES responded that "yes we are still looking for a car." He asked "can I come now?" Tower A explained that he was "[n]ot there" and wanted to "keep between us" because "[e]mployees [are] nosey." So Tower A asked PACTELES to "swing threw [sic] on Saturday morning?" PACTELES agreed to meet that Saturday. But the meeting did not take place. Instead, PACTELES sent a text message on September 23, 2019 that he "had an emergency over the weekend" and explained he would "swing by tomorrow."

11.    The following day, Tower A told PACTELES to "let me know when ur [sic] coming." Tower A also texted that he might need PACTELES to "look something up for me." PACTELES responded "Ok cool.. is 11 ok?"

12.    On September 24, 2019, PACTELES met with Tower A and an undercover agent ("UC"). Tower A showed PACTELES a vehicle.

Tower A also showed PACTELES a piece of paper with vehicle identification numbers written on it, asking PACTELES to find out "the impound date and the department." PACTELES explained that he "can run those." While looking at the vehicle, Tower A explained that PACTELES "ain't gotta owe me" for the car—that he "just need a couple little things like that."

13.     On September 27, 2019, PACTELES sent a text message to Tower A that he would "have that sheet completed on Monday," explaining that he had "been out sick for a few days."

14.     On October 4, 2019, Tower A sent a text message with license plate information, namely three capital letters followed by three numbers. On October 7, 2019, PACTELES responded that he "just had someone run it" and it's "a rental car company" so Tower A was "good."

15.     On October 22, 2019, PACTELES met with Tower A and the UC. During this meeting, Tower A explained he "trip[ped] out" because a "car was following him everywhere," but felt better once PACTELES "ran it for [him]" and he learned it was a "rental." At this meeting, Tower A gave PACTELES a Chevrolet Impala. For the title paperwork, Tower A explained that he was "saying" PACTELES paid $3,900 for the

vehicle "if anybody ever asked." Tower A also gave PACTELES $800 in cash to use for insurance, saying this was so Tower A was good "for a while"—so that if Tower A "need[s] something," PACTELES would "answer the phone." PACTELES responded "yeah … of course."

16.     On December 5, 2019, PACTELES asked Tower A for $1,500 or $1,600. Tower A said he would give the money because PACTELES had done him "favors"—that he "scratched my back, I'm going to scratch yours." Tower A said he would give PACTELES $2,000 to "help me [Tower A] out when I need it."

17.     On December 10, 2019, the UC gave PACTELES $2,000 on behalf of Tower A. The UC explained that he needed someone "on the inside." PACTELES said he would "take care of my end."

18.     On December 11, 2019, Tower A told PACTELES that he would give him $500. (PACTELES and Tower A had spoken previously about getting insurance coverage for the Impala that Tower A previously gave. Tower A said he would give PACTELES $500 to help pay for the insurance.)

19.     On December 17, 2019, Tower A provided PACTELES with $500. Tower A clarified that he would need "little" things, like searching

or "running" a plate. PACTELES explained that he was in it "to help your [Tower A's] business."

20.    The City of Detroit received more than $10,000 in federal funds during the 2019 calendar year.

## **CONCLUSION**

21.    Based on the information stated above, there is probable cause to believe that MICHAEL PACTELES committed bribery in violation of 18 U.S.C. § 666(a)(1)(B).

Brett Mason, Special Agent
Federal Bureau of Investigation

Sworn to before me and signed in my presence and/or by reliable electronic means.

Honorable Elizabeth A. Stafford
United States Magistrate Judge
Eastern District of Michigan